SAMUEL BURTON, JR. *v.* STATE OF INDIANA.

[No. 671S174. Filed February 26, 1973. Rehearing denied May 2, 1973.]

*James L. Brand,* of Greenfield, for appellant.

*Theodore L. Sendak,* Attorney General, *Mark Peden,* Deputy Attorney General, for appellee.

HUNTER, J.—This is an appeal by Samuel Burton, Jr., appellant (defendant below) from a conviction in the Henry Circuit Court for first degree murder (felony murder). The Marion County Grand Jury charged the defendant with first degree murder on August 21, 1969. The indictment consisted of two counts—one for first degree murder and the other for felony murder. The defendant was tried by a jury, which returned a guilty verdict on November 20, 1970. A motion

to correct errors was filed and overruled resulting in the present appeal.

Appellant raises several specifications of error which we will consider individually. Due to voluminous facts, they will be set out in connection with the relevant allegation of error.

I

Appellant contends that the trial court erred in failing to grant the appellant's request for a change of venue. He further argues that venue was not proved in Henry County. We believe that the trial court was correct in its denial and that the cause was properly venued to Henry County.

The appellant's argument regarding the court's failure to grant the requested change is two-pronged: a defendant may receive more than one change of venue upon a showing of good cause or alternatively the trial court should grant the requested change as a *matter of law* when the state fails to file counter-affidavits denying appellant's allegations of bias and prejudice.

As a preface to our analysis of appellant's arguments, it is important to note that the appellant *received* three requested changes of venue: Marion to Hamilton; Marion to Hancock (after the cause had been remanded to Marion Criminal Court) ; and Hancock to Henry. The changes were effectuated pursuant to the striking procedures found in CR. 12. The appellant, after agreeing to a date for trial, moved for a fourth change of venue based on "bias and prejudice of the people of said county against him and his defenses herein." A hearing was held and subsequently the motion was denied on grounds that the appellant failed to make an adequate showing of prejudice and bias.

In 1970, CR. 12 provided for one change of venue as a matter of right in all cases *punishable by death*. First degree

murder was such a case and the trial court acted in conformity therewith. Thereafter all changes are within the discretion of the trial court and must be predicated on a showing of good cause. Two such changes were granted. However, the appellant argues that still another change should have been granted for good cause shown. *We do not agree with the latter contention.* Change of venue is a procedural safeguard employed by courts under our rules to help maximize the possibilities for a fair trial untainted by community bias and predisposition. To this end, a trial judge, in his discretion, should grant additional changes of venue if an adequate showing of bias and prejudice has been made. See *Brown* v. *State* (1969), 252 Ind. 161, 247 N. E. 2d 76; *State ex rel. Schaaf* v. *Rose* (1943), 222 Ind. 96, 51 N. E. 2d 856; *State ex rel. Gannon* v. *Porter Circuit Court* (1959), 239 Ind. 637, 159 N. E. 2d 713; *Irvin* v. *Dowd* (1961), 366 U.S. 717, 81 S. Ct. 1639 (U.S. Supreme Court cites with approval and construes *Gannon*).

In *Brown, supra,* this Court said:

"We hold that it was within the discretion of the trial court to weigh the evidence comprised of both documentary and oral testimony and determine its credibility in light of the purpose sought to be obtained. . . . The trial court had the right to weigh the content of the exhibits and determine their effect on the 'public attitude' toward the defendant." 252 Ind. at 173, 247 N. E. 2d at 83.

We held that such determination must be made after the defendant has received a fair hearing on his application for change. Such a hearing *was* conducted in the instant case.

Viewing the record of that hearing in a light most favorable to the State, there is no evidence to support the appellant's allegation of community bias and prejudice in Henry County. The evidence adduced by the appellant is as follows: (1) the sheriff may or may not have liked the defendant and may have called him a son of a bitch; (2) the sheriff's wife, the

jail matron, did not like the defendant; (3) fellow inmates in jail on at least two occasions called defendant a nigger; (4) several inmates (five or six) articulated a dislike for defendant at the time they were released from jail; (5) an article concerning the case had appeared in an Indianapolis newspaper; and (6) a Henry County attorney, not involved in the case, testified that several Henry County residents questioned him regarding the case. He testified as follows:

> "Not by name, except they referred to him as the man that . . . the inquiry has been to me whether or not I had anything to do with the fellow from Indianapolis who shot the newspaperman. That's the way it was referred to me."

There simply is no evidence that the jury was in any way prejudiced or biased or that the community as a whole exhibited a "pattern of deep and bitter prejudice." *Irvin* v. *Dowd, supra,* at 727. The U.S. Supreme Court characterized the facts of *Irvin* as follows:

> "For example petitioner's first motion for a change of venue from Gibson County alleged that the awaited trial of petitioner had become the cause celebre of this small community . . . so much so that curbstone opinions not only as to petitioner's guilt but even to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcasted over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicated that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial." 366 U.S. at 725.

In *Brown, supra,* we held that the trial court did *not* exceed its discretion in denying the defendant's application for a change of venue from Vanderburgh County. In that case, the defendant presented uncontroverted evidence consisting of five newspaper articles, including an editorial, a daily column and news stories, which appeared in the Evansville newspapers prior to trial and the testimony of both the defendant and his brother articulating their fear that the

defendant would not receive a fair trial due to all the publicity. We believe that the appellant in the case at bar presented a weaker argument for community prejudice than did the defendant in *Brown* and that his motion for a change of venue was properly denied.

Proof of venue is also controverted by the appellant. He mistakenly believes venue was *not* proved in Henry County. the county to which his cause was transferred pursuant to *his* request for change of venue. In *Watts v. State* (1950), 229 Ind. 80, 95 N. E. 2d 570 this Court addressed itself to the issue now in controversy:

> "In this state, a change of venue from the county can only be taken by the defendant. The proof therefore that the change of venue . . . was *taken under our statutes* is in and of itself sufficient to show that appellant took the change of venue." (our emphasis) 229 Ind. at 89, 95 N. E. 2d at 574.

Upon the appellant's motion, the trial court ordered the change pursuant to the striking provisions of CR. 12 and, therefore, the statutory requirements for a change of venue were clearly satisfied. We believe venue was conclusively established in Henry County and that any contrary arguments are frivolous and without foundation.

## II

The appellant specifies the following as error with respect to his confession:

(1) he was never properly and fully advised of his constitutional rights *prior* to the time the statements were made;

(2) he did not *voluntarily* and *knowingly* waive his constitutional rights and his confession was not voluntary.

(3) he was incapable of voluntarily and knowingly waiving his constitutional rights because he was under the influence of drugs. Appellant relies on the following prescription in *Miranda* v. *Arizona* (1966), 384 U.S. 436, which he believes

has, in part, been disregarded by the Indianapolis Police Department:

> "We hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him *prior to any questioning* if he so desires." (our emphasis) 384 U.S. at 478.

The issue, therefore, is whether the warnings given to the appellant conform to the requirements of *Miranda* and more specifically, was he apprised of his right to an attorney *prior* to *any* questioning.

In order to determine the adequacy and timeliness of the warnings, we must examine the testimony offered at the hearing on the appellant's motion to suppress. A homicide captain, present at the time of the arrest (about 12:45 P.M.), testified that at that time the suspect was advised as follows:

> "He was advised that he had a right to remain silent . . . that anything that he did say could be used against him later in court . . . that he would have a right to have an attorney . . . if he didn't have an attorney, one would be furnished to him by the State of Indiana, and he was advised of the charge he was being arrested for."

Subsequent to his arrest the appellant was taken to a questioning room at about 1:30 P.M. Prior to any interrogation, a rights waiver form which is used by the Indianapolis Police Department, was given to the appellant. One of the two interrogating officers read the rights form to him while the

appellant read along. "Indianapolis Police Department advises as follows:

(1) You have a right to remain silent.
(2) Anything which you say can be used against you in court.
(3) You have a right to have a lawyer present *now*.
(4) If you don't have the money to retain a lawyer, you have the right to have one appointed for you by the court." (our emphasis)

The reading officer and the appellant then signed, the appellant acknowledging his comprehension of the form. The appellant, after "an hour or an hour and a half" of questioning, gave a statement. He was then taken upstairs to the lock-up and given lunch. From this time (about 3:00 P.M.) until about 9:00 that evening the appellant was left alone in his cell.

At about 9:00, the aforementioned homicide captain met with the appellant in the homicide office conference room. The captain immediately advised appellant of his rights.

"I advised him that he had a right to remain silent, I advised him that anything he said to me could be used against him in court, *I advised him that he had a right to have an attorney at that time or at any time,* and I advised him that if he couldn't afford to hire an attorney that one would be furnished for him by the court. I further advised him he didn't have to talk to me at all if he didn't wish to." (our emphasis)

After this oral warning, the captain presented him with a copy of the waiver form. The captain read aloud the top portion of the form which recites the accused's rights. The form was then handed to the appellant. The captain requested that the appellant read the bottom portion with particular emphasis and stated that he (appellant) could sign it if he wished. The appellant then read the bottom half aloud to the officer:

"I have read the above and understand it fully. I wish to make a voluntary statement and I do not want a lawyer. No force, threats or promises have been used by anyone, in any

way, to make me sign this and I sign this statement having been advised of the above rights before any questions have *been asked of me.* Signed Samuel Burton, Jr." (our emphasis)

Thereafter a discussion ensued between the captain and appellant, wherein the officer disclosed to the appellant the nature of the alleged crime and the potential penalties involved. The captain then asked the appellant if he would like to make a statement and he indicated his desire to do so. Two of the officers were summoned into the room and in the presence of all three officers, he gave his statement which was recorded on a dictaphone and later reduced to a type-written document.

The captain testified that prior to his statement, the appellant was again advised of his rights:

> "I again informed him that he had a right to remain silent, he did not have to talk to us. I advised him that he had a right to have an attorney present then or at any time during the time we took this statement, *if he so indicated he wanted an attorney we would stop and get him one.* Whatever he did give us could be used against him in criminal proceedings, and I advised him if he could not afford an attorney that all he would have to do would be to tell us, and when we took him to court the court would see that he was furnished with legal advice." (our emphasis)

The captain then read aloud the top portion of another police form which reads:

> "I have been advised that anything I say in the following statement may be used against me in future criminal proceedings, I have not been promised any reward or leniency, I have not been threatened or abused in any way to make me give this statement. I make the following statement of my own free will."

Thereafter and immediately prior to the taking of the formal statement, the captain again *went over all the accused's rights.* After the statement was typed the statement was read to the appellant, and the captain asked if he would sign the

statement. After the captain gave the appellant *a final explanation of his rights*, the appellant signed the document.

Appellant contends that at no time during his interrogation was he informed of his right to an attorney *prior* to any questioning, the closest admonition being "you have a right to a *lawyer present now*" found in the rights waiver form. It is true that the exact words of *Miranda* ("prior to any questioning") were not communicated to the appellant. However, words importing the same meaning were in fact used by the officers involved. "You have a right to a lawyer present now," and he was informed verbally that "he had a right to have an attorney at that time or at anytime" and "if he so indicated he wanted an attorney we would stop and get him one" all convey essentially the same message. *Miranda* requires that the accused be fully apprised of his right to have counsel present during the interrogation. We believe that requirement has been satisfied. After all, "*Miranda* is not a ritual of words to be recited by rote." *Jones* v. *State* (1969), 253 Ind. 235, 252 N. E. 2d 572, quoting with approval *Coyote* v. *United States* (1967), 10th Circuit, 380 F. 2d 305.

Appellant believes the rights form used by the Indianapolis Police Department is contradictory and ambiguous. He contends that when "you have a right to have a lawyer present now" is followed by "you have the right to have one appointed for you by the court," the accused is faced with a hapless ambiguity. However, this Court has held that this very language adequately informs arrestees of those rights set out in *Miranda*. *Emler* v. *State* (1972), 259 Ind. 241, 286 N. E. 2d 408.

The appellant argues, notwithstanding the adequacy of the language, that the warnings did not conform to *Miranda* because they were given when the appellant was already in an "interrogation situation." That is to say, he was under custody in an interrogation room confronted with police officers. We are unable to find any merit in such a contention.

More than adequate warnings were given to the appellant prior to the actual questioning. In fact, we believe the record indicates an inordinate respect for the maxims of *Miranda* on the part of the Indianapolis Police Department.

The U.S. Supreme Court in *Miranda* sets out the factors to be considered in determining the voluntary or involuntary nature of a confession:

> "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact *of lengthy interrogation or incommunicado incarceration before a statement is made* is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was *threatened, tricked, or cajoled* into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476 (our emphasis)

And this Court has said:

> "The question is whether, looking at all the circumstances, the confession was free and voluntary, and not induced by any violence, threats, promises, or other improper influence." *Nacoff v. State* (1971), 256 Ind. 97, 267 N. E. 2d 165 at 167.

The state, according to *Miranda,* has a "heavy burden . . . to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination." We have adopted this standard in past decisions. *Nacoff, supra; Dickerson* v. *State* (1972), 257 Ind. 562, 276 N. E. 2d 845. The issue, therefore, before this Court, is whether the state met its "heavy burden," i.e., proved beyond a reasonable doubt that the confession was voluntarily given.

The record indicates that the length of the interrogation sessions was not unreasonable. Furthermore, the appellant was not held incommunicado. He was afforded the opportunity to use the telephone and did in fact use it *several* times be-

tween the time of his arrest and the time of his evening interrogation. The police testified that the appellant could have had visitors had anyone asked to see him. Moreover, the record does not support any allegations of threats, tricks, or cajoling. The fact two statements were given by the appellant is not, as the appellant urges, conclusive of any coercion. The record simply does not indicate that either statement (only the second was entered into evidence) was made involuntarily as the result of coercion or cajoling.

The appellant alleges that he was incapable of voluntarily waiving his constitutional rights because he was under the influence of drugs. There is no evidence that the appellant *was* under the influence of drugs. In fact, a police officer testified that the appellant told him he had *not* been using drugs that day.

### III

Appellant contends that evidence was obtained as a result of an illegal search and urges that such evidence was erroneously admitted. Illegally seized evidence is excludable only if the person complaining has standing to challenge its admissibility. Appellant believes he has satisfied the requirements of standing and hence, should be allowed to attack the legality of the aforementioned search and the admissibility of the seized material.

Appellant asserts, and rightly so, that the standing requirement is satisfied by establishing: (1) a possessory interest in the searched premises[1] or (2) that possession of the seized items is the basis of the offense or possession is an essential element of the offense. See *Jones* v. *United States* (1960), 362 U.S. 257; *Simmons* v. *United*

---

1. The United States Supreme Court has defined such a possessory interest as one which gives rise to a "reasonable expectation of freedom from governmental intrusion" upon those premises in addition to legal possession or ownership of the searched premises: *Mancusi* v. *DeForte* (1968), 392 U.S. 364; *Combs* v. *United States* (1972), 408 U.S. 224, 33 L. Ed. 2d 308. This Court has also adopted this standard. *Mitchell* v. *State* (1972), 259 Ind. 418, 287 N. E. 2d 860.

*States* (1968), 390 U.S. 377, and *United States* v. *Allsenberrie* (1970), 424 F. 2d 1209 (7th Circuit). The appellant argues that he had a possessory interest in the premises at the time of the search and that the possession of the seized evidence is itself an essential element of the offense with which he was charged, i.e., felony murder—robbery. We believe he fails on both counts.

The review of the record discloses the following:

(1) Appellant had stayed at the premises two or three nights per week and sometimes a week at a time.

(2) The apartment was rented by a friend of appellant. Appellant, however, testified that he sometimes assisted in making the rental payments.

(3) Appellant was given a key to the apartment.

(4) On the day of the search, appellant testified that he had some clothing in the apartment.

(5) The police testified they found no clothing in the apartment.

(6) Appellant testified that the rent was paid for the apartment until two days *after* the search.

(7) Appellant helped his friend move out of the premises a few hours before the murder and subsequent search.

(8) Appellant maintained his own apartment elsewhere.

(9) The manager of the apartments stated that the appellant's friend was asked to and did in fact move out that evening. To the best of the manager's knowledge, he was asked to vacate the premises because the rent was delinquent.

(10) The manager stated that no belongings were left in the apartment.

(11) The manager received a key for the apartment back from "somebody" the evening when the appellant's friend moved.

Viewing this evidence in a light most favorable to the state, we conclude that the appellant, at the time of the search,

had no possessory interest in the premises. The keys returned, the clothes removed, the actual move made, the rent being in arrears, and subsequent notice to quit all lead us to the conclusion that the appellant's friend terminated his tenancy. The appellant having no legal interest in the premises, i.e., he was not the lessee of record, can only claim a possessory interest through the legal lessee. Once the lessee's interest was extinguished, the appellant no longer had a possessory interest in the premises.

The appellant argues, speciously, that possession of the stolen property (in this case the victim's billfold and partially charred papers bearing the victim's name) is an essential element of felony murder—robbery.

IC 1971, 35-13-4-1 (Ind. Ann. Stat. § 10-3401 [1956 Repl.]) defines first degree murder:

> "Whoever purposely and with premediatated malice, or in the perpetration of or attempt to perpetrate a . . . robbery . . . kills any human being . . ."

The issue, therefore, is whether possession of the stolen goods is an element of the offense of robbery. The essential elements of robbery are: (1) an unlawful taking (2) from the person of another of (3) any article of value (4) by violence or by putting in fear. IC 1971, 35-13-4-6 (Ind. Ann. Stat. § 10-4101 [1956 Repl.]) ; *Jackson* v. *State* (1971), 257 Ind. 477, 275 N. E. 2d 538; *Woods* v. *State* (1970), 255 Ind. 483, 262 N. E. 2d 192.

Clearly possession of the stolen goods is not an *essential element of robbery.* Such possession may be an *essential element of the evidence,* crucial in establishing an evidentiary nexus between the taking and the accused. In this case, the victim's billfold found in the apartment did in fact help to establish that link.

Two cases upon which the appellant relies, *Jones, supra,* and *Allsenberrie, supra,* can easily be distinguished from the case at bar. In both of those cases, possession was the

essence of the offense—possession of narcotics and possession of stolen goods. However, in a case such as the one before us, (if in fact a billfold in an abandoned apartment may be considered "possession") such possession only enables the trier of fact to *infer* that certain elements of the offense are present and does not constitute an element of the offense.

## IV

Appellant alleges that the State's exhibit number 27A, depicting an apple tree, was erroneously admitted into evidence. It is contended that the exhibit (a diagram) showing the dimensions of the tree's foliage made October 17, 1970, 17 months after the alleged crime (May 17, 1969) did not truly reflect the dimensions of the tree at the time of the crime. It is argued that such a misrepresentation was prejudicial because the exhibit was used by the State to refute the testimony of two alleged eye witnesses who claimed they saw a *white man* kneeling over the deceased's body.

The merit of this contention is predicated upon the existence or non-existence of proof (at trial) of the tree's subsequent growth and increase in foliage. The burden is squarely on the objecting party to establish such a fact. The engineer who designed the diagram testified (based on prior personal observation): "I'm sure it wasn't quite that big on that day, I'm sure its grown since then." However, both the engineer and a police officer testified that the tree had been trimmed sometime during the period between the night of the crime and the taking of the measurements by the engineer. It is apparent that there is no evidence to support the appellant's notion that the apple tree was significantly larger when the measurements were taken. In fact, the most reasonable and natural inference one could draw from this evidence is that the tree was smaller when measured. The appellant obviously did not meet his burden and for that reason, we hold that the trial court did not err in admitting exhibit number 27A.

## V

Appellant contends that the trial court erred in overruling his motion for a mistrial based upon a highly prejudicial article which appeared in an Indianapolis newspaper during the trial. The article misstated testimony of the appellant's two witnesses indicating that the witnesses observed a *black* man stab the decedent, whereas, in fact, the two witnesses testified that the man they saw was *white*.

The appellant concedes that the minimal required protection was afforded the appellant pursuant to *Harris* v. *State* (1967), 249 Ind. 681, 231 N. E. 2d 800 and *Napier* v. *State* (1971), 255 Ind. 638, 266 N. E. 2d 199 but argues that such protection was inadequate due to the gravity of the prejudicial material and the procedure used by the trial court in polling the jury. The trial judge indicated to each one of the jurors that an article in a certain Indianapolis newspaper was in existence which concerned their case. The appellant believes that such method of polling only worked to exaggerate the effect of the article; that human nature being what it is, the jurors would seek out the article and read it.

We find no merit in such an argument. There is absolutely no evidence that any of the jurors had read the article at the time of the polling or that as a result of said publication the appellant was prejudiced. It is mere conjecture as to whether the jury would read the article later. In fact by making such an assumption, the appellant impugns the integrity of the jury. Furthermore, if the appellant was so convinced that the jurors would subsequently read the article, why did he not move to sequester the jury? The record is devoid of any such motion. We hold that the trial court did not err by denying the appellant's motion for mistrial.

## VI

Appellant contends that the trial court erred in not directing a verdict in his favor at the conclusion of all the evidence.

He also argues that there was insufficient evidence adduced to support the jury's verdict. Appellant argues that the State failed to prove the following beyond a reasonable doubt:

(1) that the deceased was put in fear at the time the property was allegedly taken. Count II of the indictment specifically avers that the deceased was placed *in fear* by the appellant;

(2) that the appellant took $20.00 from the decedent;

(3) that the appellant killed the decedent by cutting and stabbing during the commission of a robbery.

Appellant asserts that (1) is unsubstantiated by *any* evidence while (2) and (3) are supported only by his bare extra judicial confession, uncorroborated by any other evidence.

When reviewing an appeal on sufficiency of the evidence, first, it must be remembered that this Court will not weigh the evidence nor determine the credibility of the witnesses. Only that evidence most favorable to the State and the reasonable inferences to be drawn therefrom will be considered. As long as there is substantial evidence of probative value sufficient to establish every material element of the crime beyond a reasonable doubt, the verdict will not be disturbed. *Jackson* v. *State* (1971), 257 Ind. 477, 275 N. E. 2d 538; *Shelton* v. *State* (1972), 259 Ind. 559, 290 N. E. 2d 47.

We find no merit in the appellant's allegation that fear was not proved. To begin with, the appellant's confession which was correctly admitted into evidence, speaks for itself:

"So we waited 'til he staggered across the street, when he staggered across the street he seen us behind him, he tried to speed up. He started running, when he started runnin' I ran and caught him, when I caught him, he started *screaming* and *hollering*, threw him down, and we threw him down and grabbed him. And he started to *screaming, real loud, hollering, 'help, help, help.'* Tusseling and when he was tusseling I told him to be still, he wouldn't be still and I stabbed him." (our emphasis)

Furthermore, an inference of fear can be reasonably drawn from an act of robbery. See *DeWeese* v. *State* (1972), 258 Ind. 520, 282 N. E. 2d 828. In fact, to infer otherwise would border on the absurd.

We believe the evidence sufficiently establishes that the money was taken from the victim by the appellant or his accomplice and that the appellant killed the decedent by cutting and stabbing. In order to admit a confession, independent evidence of the *corpus delicti* must be adduced.. See *Jones* v. *State* (1969), 253 Ind. 235, 252 N. E. 2d 572; *Brown* v. *State* (1958), 239 Ind. 184, 154 N. E. 2d 720; *Wahl* v. *State* (1951), 229 Ind. 521, 98 N. E. 2d 671. However, there *was* independent evidence adduced at trial, albeit circumstantial.

It is the duty of the jury to weigh the evidence and determine whether an accused is guilty beyond a reasonable doubt. We believe enough evidence existed that would allow a reasonable juror to conclude that the appellant perpetrated a robbery resulting in the purposeful killing of the deceased.

The appellant, in his statement, admits robbing the deceased of $20.00 and stabbing him to death. However, corroborating testimony and surrounding circumstances buttress the confession:

(1) A witness, who lived in the apartment across from the aforementioned searched apartment, testified that the appellant, in her (the witness') presence, said to his accomplice, "Man, I have to take off somebody so I can pay my rent" ("take off somebody" is slang for rob). The accomplice had a butcher knife and a gun which he gave to the appellant. The conversation transpired near the appellant's friend's abandoned apartment.

(2) The two men then proceeded down to a nearby intersection. After their departure, the witness left the apartment complex but returned fifteen minutes later. Upon her return, she saw the police on the side of the apartment house, the

accomplice's gun on the ground and heard the appellant and his accomplice upstairs in the abandoned apartment across the way.

(3) The police brought a butcher knife out of the apartment. The witness identified it as the same one the accomplice had earlier given the appellant.

(4) The deceased was the victim of a felonious homicide, having been stabbed to death. He was found by a police officer in a yard of a nearby apartment building. There was no identification and no billfold on the body. The police officer testified that his "pockets were turned out, his clothing was dissheveled quite a bit."

(5) The deceased's billfold was found in the apartment searched by the police.

We hold that the appellant's guilt or innocence was a proper question for the jury, and that sufficient evidence was adduced to support the jury's verdict.

## VII

Appellant specifies three instances of error in the giving of instructions. He presents the following arguments:

(1) In instruction number 10 given to the jury, the felony murder statute is recited: "Whoever in the perpetration of or an *attempt* to perpetrate . . ." (appellant's emphasis) The appellant argues that since the indictment makes no mention of "attempt," such an instruction including "attempt" was prejudicial error in that it did not precisely conform to the language of the indictment. In support of this allegation, appellant directs our attention to *Welty* v. *State* (1912), 180 Ind. 411, 100 N. E. 73. *Welty* propounds the proposition that the court's instructions must contain a precise explanation of the essential elements of the crime charged. Appellant contends that instruction number 10 was *not* a precise explanation of the crime charged.

We do not agree. On the contrary, the instruction *does* precisely explain and define the crime charged by restating the

statute. There was no attempt to *verbatim* restate the indictment, only to quote the statute from which the indictment was drawn. Furthermore, we have held that the insertion in an instruction of a word not found in the indictment, is not error if the indictment is not vitiated by the omission. *Davis* v. *State* (1925), 196 Ind. 213, 147 N. E. 766. The State proved the actual perpetration beyond a reasonable doubt making it difficult to ascertain what kind of prejudice could have been visited upon the appellant. There is no evidence of any such prejudice nor does the appellant direct us to any.

(2) Appellant contends that the trial court erred in not sustaining his objection to instruction number 12 which states that the State must prove that money of the "approximate value of $20.00" was taken from the deceased. It is argued that such an instruction does not precisely recite the allegation in the indictment (the indictment states $20.00 *period*). He alleges, and rightly so, that the State must prove, beyond a reasonable doubt, each and every material allegation in the indictment.

Sufficient evidence was adduced to support each and every material allegation in the indictment beyond a reasonable doubt. Twenty dollars was alleged and twenty dollars was proved. The fact that the word "approximate" was used in the instruction in no way impugns the findings of the jury nor does its omission from the indictment vitiate the indictment. In short, we consider the use or omission of "approximate" to be immaterial and the contention to the contrary frivolous.

(3) Appellant argues that his tendered instruction number 29 was a correct statement of the law and therefore, incorrectly refused by the trial court. The instruction reads as follows:

"If you find from the evidence that the defendant did not remove from the person and possession of the said [victim] money of the value of twenty [$20.00] dollars

while in commission of the offense of robbery, then you must find the defendant not guilty of count two . . ."

The instruction was properly refused by the trial court for it does not accurately state the law. It is not necessary in a conviction for felony murder—robbery that the State prove that the defendant personally removed the thing of value from the victim. Where two or more defendants act in concert to commit a robbery, ". . . It is not essential that participation of any one defendant in each element of robbery be established . . . It is immaterial whether [the defendant] personally took anything of value, since the evidence is sufficient to establish that his confederates did." *Cline* v. *State* (1969), 253 Ind. 264, 252 N. E. 2d 793 at 795. See also IC 1971, 35-1-29-1 (Ind. Ann. Stat. § 9-102 [1956 Repl.]).

For all the foregoing reasons, the judgment of the trial court should be affirmed.

Judgment affirmed.

Arterburn, C.J., Givan and Prentice, JJ., concur; DeBruler, J., dissents with opinion.

## DISSENTING OPINION

DeBruler, J.—Involved in this case is the identical rights form considered by the Court in *Emler* v. *State* (1972), 259 Ind. 241, 286 N. E. 2d 408. I remain convinced that this form does not conform to the constitutional requirements of *Miranda* v. *Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 694. It did not inform appellant that if he did not have sufficient funds to employ a lawyer, one will be furnished him before questioning and that he had a right to have a lawyer present during the questioning. It is also contradictory and confusing. The accused is told that he has a right to an attorney *now*. He is then told that if he has no money to employ a lawyer he has a right to have one appointed by the *court*, and this at a time when he is obviously not in court and does not

know when he will be taken to a court. To say that a lawyer will be appointed by the court without further explanation is the same as saying that the lawyer will be appointed at some unspecified time in the future and is contradictory to the former statement that he has a right to counsel now. *Emler* v. *State, supra,* (DeBruler, dissenting). This is not the "effective and express explanation" of the right to counsel required by the *Miranda* case. In holding a similar incomplete and confusing rights form to be a violation of the *Miranda* requirement, the Seventh Circuit Court of Appeals in *United States ex rel. Williams* v. *Twomey,* 467 F. 2d 1248 (7th Cir., 1972), recently stated:

> "In one breath, he [appellant] was informed that he had the right to appointed counsel during questioning. In the next breath, he was told that counsel could not be provided until later. In other words, the statement that no lawyer can be provided at the moment and can only be obtained if and when the accused reaches court substantially restricts the absolute right to counsel previously stated; it conveys the contradictory alternative message that an indigent is first entitled to counsel upon an appearance in court at some unknown future time. The entire warning is therefore, at best, misleading and confusing and, at worst, constitutes a subtle temptation to the unsophisticated, indigent accused to forego the right to counsel at this critical moment."

The same must be said of the rights form in the case before us.

Additionally involved in the case before us is a problem arising from multiple advisements and multiple statements. Appellant was twice interrogated by the police. During each interrogation he gave a statement. Prior to each interrogation session appellant was given an advice of rights anew at least twice. These advisements are quoted in the majority opinion. The majority then lumps all of these together and concludes that they collectively demonstrate that appellant was fully apprised of his *Miranda* rights, and that the second statement was therefore constitutionaly admissible. I disagree with this approach. The only relevant advice of rights in this case would be those which preceded the giving of the first statement

to the police interrogators. In my view, if the first statement was taken in violation of the constitutional rights of the appellant, the second statement, given six hours thereafter while appellant was in continuous custody and without benefit of counsel would likewise be constitutionally inadmissible. The second statement would be the direct product of the first illegally obtained statement, and as such would likewise be illegally obtained. *Darwin* v. *Connecticut* (1968), 391 U.S. 346, 88 S. Ct. 1488, 20 L. Ed. 2d 630; *Williams v. Twomey, supra.* I conclude that the second statement was erroneously admitted in evidence. This conviction should be reversed and a new trial ordered.

NOTE.—Reported in 292 N. E. 2d 790.